IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANNIEL W. B.,[1] | ) |
|         Plaintiff, | ) |
| v. | ) Case No. 20-cv-145-RJD[2] |
| COMMISSIONER of SOCIAL SECURITY, | ) |
|         Defendant. | ) |

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI benefits in November 2013, alleging an onset date of October 15, 2010 (Tr. 12). Plaintiff's claims were denied initially in January 2014 and upon reconsideration in November 2014 (Tr. 12). Plaintiff requested an evidentiary hearing and afterwards, ALJ Kevin Martin denied Plaintiff's application in October 2015 (Tr. 26). The Appeals Council denied Plaintiff's request for review (Tr. 732). Plaintiff filed a Complaint in the U.S. District Court for the Northern District of Illinois and the Court remanded the matter, finding

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.   See Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Pursuant to 28 U.S.C. §636(c), this case was assigned to the undersigned for final disposition upon consent of the parties (Doc. 16).

that ALJ Martin improperly weighed the opinions of Plaintiff's treating psychiatrist, Dr. Linda Hungerford (Tr. 745-757).

After a hearing on remand, ALJ Martin again denied Plaintiff's application on February 28, 2018 (Tr. 1073).  Magistrate Judge Donald G. Wilkerson remanded the case, finding that ALJ Martin again improperly weighed Dr. Hungerford's opinions (Tr. 1085-1099).  A third hearing took place on November 4, 2019, and thereafter ALJ Michael Scurry denied Plaintiff's application for disability, DIB, and SSI (Tr. 990, 1008-1009).  Plaintiff filed a timely Complaint in this Court.

## Issues Raised by Plaintiff

Plaintiff makes the following arguments:

1. The ALJ failed to analyze entire lines of evidence related to the swelling in Plaintiff's feet and the side effects of his medication.

2. The ALJ erred in evaluating the opinion evidence.

3. In the hypothetical questions to the vocational expert, the ALJ failed to include Plaintiff's moderate limitations in concentration, persistence, and pace.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]  Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step other than step 3 precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Importantly, this Court's scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). This Court determines whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of

credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above. He determined that Plaintiff did not engage in substantial gainful activity from his alleged onset date of October 1, 2010 (Tr. 992).

ALJ Scurry found that Plaintiff has the following severe impairments: degenerative disc disease status post fusion in August 2014; sacroiliitis; obesity; dysthymic disorder; mood disorder; generalized anxiety disorder ("GAD"); personality disorder; post-traumatic stress disorder ("PTSD"); obsessive compulsive disorder ("OCD"); and attention deficit hyperactivity disorder ("ADHD") (Tr. 993). However, he found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" *(Id.)*.

The ALJ found that Plaintiff has the residual functional capacity to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolding. He can occasionally stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to hazards such as unprotected heights. He can understand, remember, and apply information for unskilled, short, simple instructions, and can concentrate, persist, and maintain pace for such unskilled, short simple tasks in a routine setting. He cannot interact with the public.

(Tr. 996).

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff was unable to perform past relevant work through the date last insured yet concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (Tr. 1007).

**The Evidentiary Record**

The Court reviewed and considered the entire evidentiary record in formulating this Order. The following summary of the record is tailored to Plaintiff's arguments.

**1.     Agency forms**

In Plaintiff's initial disability report, he reported that he stopped working on October 15, 2010 because he was laid off and not able to return to work because he suffered from the following conditions: 1) mood disorder; 2) PTSD; 3) OCD; 4) ADHD; and 5) back problems (Tr. 226).  He was taking Paroxetine, prescribed by Dr. Gary Tennison for depression, anxiety, OCD, ADHD, and PTSD (Tr. 229).

Plaintiff completed a function report in August 2014 in which he stated that he was limited by his anxiety and depression (Tr. 281).  He could not "cope well in public or do well in large crowds" (*Id*.).  He had undergone back surgery, having multiple pieces of hardware placed in his spine. (*Id*.).  His mental health issues combined with his back surgery left him "in bad shape" (*Id*.).

Plaintiff completed a work history report in December 2013 (Tr. 264).  His last job was working as a fabricator in a factory from 2004-2009 (*Id*.).  Prior to that position he worked as a trash picker from 1998-1999 and a car washer from 1999-2004 (*Id*.)

**2.     Evidentiary Hearings**

At Plaintiff's first evidentiary hearing on September 14, 2015, he testified that he started having back problems in 2009/2010 (Tr. 43).  He had not worked or looked for work since 2010 (Tr. 41).  He testified that in his most recent job (a fabricator), he was fired because he was missing too much work related to his mental health and back pain.  His back pain kept him from

standing for more than 45 minutes and kept him from sitting more than 30-60 minutes at a time (Tr. 51). The pain also made it difficult for him to walk (Tr. 43). Neither his primary care doctor (Dr. Tennison) or his back surgeon would give him any medication stronger than over-the-counter medications like Advil (Tr. 44).

Plaintiff described abuse during his childhood that included his stepfather throwing firecrackers under his feet or chair (Tr. 54). Dr. Tennison prescribed medications for his anxiety, depression, and bipolar disorder/schizophrenia (Tr. 46). The medication makes him drowsy, and he has to nap twice a day for 60-120 minutes at a time (Tr. 53). He had previously treated with a psychiatrist (Dr. Hungerford) and a therapist, but he did not feel like they were giving him the help he needed, and it took him two hours round trip to travel to their office (Tr. 46).

Plaintiff testified that if he is on his feet for more than 30-45 minutes, his legs swell (Tr. 53). To reduce the swelling, he must elevate his legs for 60-90 minutes (Tr. 53). This issue started in approximately 2011 or 2012 (Tr. 58). His doctors told him that being overweight and his "back issues" probably cause the swelling (Tr. 58). His doctors recommended that he exercise and told him to elevate his feet (Tr. 58).

At the second evidentiary hearing, Plaintiff testified that his back pain had increased since the previous hearing in September 2015 (Tr. 701). He had been receiving steroid epidural injections, which would sometimes "last for a couple of months" or a month, or not help at all (Tr. 702). He was also taking Gabapentin for the pain, which helped "some" (Tr. 703).

At the third evidentiary hearing, Plaintiff testified that before his spinal fusion surgery in August 2015, the surgeon told him that he would only return to "50%" following surgery (Tr. 1033). Plaintiff testified that there was "not much" improvement following the surgery (Tr.

1033).  In September 2019, he received a steroid injection from a pain management doctor (Tr. 1033).  The injection alleviated his pain for "maybe a month, or two" (Tr. 1033).

As for his mental health, Plaintiff has "more bad than good" days (Tr. 1035).  His medications continue to make him drowsy (Tr. 1035).  He naps for at least two hours a day (Tr. 1039).

Plaintiff testified that he spent most of his time either lying in bed on a heating pad, or in a recliner with his feet up because of swelling in his legs (Tr. 1035).  Plaintiff reported that he spent approximately 60-90 minutes a day with his feet elevated (Tr. 1039).

Vocational expert James Broderie testified that an individual who is off-task for 15% of his time-either dozing from medications or elevating his feet-would be unemployable (Tr. 1047). Generally, at the unskilled level (sedentary or light), there is no work available for a person who could only be on his feet for 60-120 minutes a day, only reach for 60-120 minutes a day, and lift no more than 10 pounds (Tr. 1048).

**4. Relevant Medical Records**

Dr. William McDonald at the Crawford Memorial Hospital Bone and Joint Center in Robinson, Illinois treated Plaintiff for a broken left ankle injury in 2011-2012.  Dr. McDonald made the following entry on January 6, 2011:

> He states that on 12/31/10 he fell off an approximately 6' wall and he was actually kind of bumped and pushed by his buddy and he said when he lost his balance he figured he could jump down and land okay but when he jumped he landed on his heels and immediately had pain. He states that the pain was and still is a 10/10…He states he is not having any back pain, not having any hip pain (Tr. 344).

Dr. McDonald saw Plaintiff multiple times in 2011 and 2012 for left foot pain (Tr. 331-

346).  None of Dr. McDonald's notes indicate that Plaintiff complained of back pain (*Id*.).

Plaintiff sought mental health treatment from the Jasper County Health Department in October 2013.  A therapist, Sharon Helregel, developed a treatment plan related to Plaintiff's depression, anxiety, lack of coping skills, and adaptive functioning deficit (Tr. 361-369). The plan included one hour of individual counseling a week, and one hour of family therapy/counseling (Tr. 367).  Helregel signed the plan in October 2013 and one month later, a psychiatrist (Dr. Hungerford) signed the plan (Tr. 369).

Also in October-December 2013, Plaintiff sought treatment from Dr. Gary Tennison at the Crawford Memorial Hospital Rural Health Clinic (Tr. 375-380).  He reported that he was receiving therapy from Sharon Helregel, and she thought he needed medication but the psychiatrist on staff at the Jasper County Health Clinic did not have any openings to see him (Tr. 378). Plaintiff further reported that he was depressed, irritable, panicky, anxious, and had a "lot of ups and downs" (Tr. 378).  Dr. Tennison noted that Plaintiff had tried to commit suicide "2-3 years ago" (Tr. 378).  It was difficult for Plaintiff to get out of the house or even out of bed (Tr. 378). Plaintiff also complained of low back pain for the last year that became worse when he walked or sat (Tr. 469).  Dr. Tennison prescribed Paxil and Rispderal for Plaintiff's depression/anxiety and Mobic for Plaintiff's back pain (Tr. 376, 471).  He also gave Plaintiff pain medication and steroid injections (Tr. 471).  Dr. Tennison ordered an MRI in January 2014 that revealed Plaintiff had a "small central disc protrusion at L5-S1" and a "mild broad-based posterior disc bulge at L4-5" (Tr. 412).

On March 5, 2014, Dr. Tennison noted that Plaintiff had "just witnessed daughter's death after resuscitation, doesn't feel like Paxil is giving him relief or working, getting shortness of

breath and tightness of chest" (Tr. 466).   Plaintiff had thoughts of suicide (Tr. 466).   Dr. Tennison discussed grief counseling with him and prescribed Xanax (Tr. 468).

Plaintiff presented to the Crawford Memorial Hospital Emergency Department on March 25, 2014 (Tr. 413).   He complained of back pain, rating it 10/10 (Tr. 413).   He reported that it became worse with walking or other movement (Tr. 413).   The ED physician's impression was "acute exacerbation of chronic back pain" and he ordered one dose of Dilaudid for Plaintiff (Tr. 414).   Plaintiff presented to Dr. Tennison on April 2, 2014 and asked to be referred to a neurosurgeon for his back pain (Tr. 459).

Plaintiff saw Dr. Pradeep Narotam (a neurosurgeon) at Union Hospital in Terre Haute, Indiana on April 23, 2014 (Tr. 508).   Dr. Narotam's physical exam summary stated "tender lower lumbar spine with bilateral lumbar paraspinal muscle tenderness, mild spasm, no triggers.   Mild hip flexor weakness related to back pain, mild knee extensor weakness" (Tr. 505).   Dr. Narotam reviewed Plaintiff's MRI images and diagnosed him with lumbar spondylothesis, degenerative disc disease, herniated lumbar disc, myofascial pain syndrome (Tr. 505).   He recommended conservative treatment: lose weight, therapy, "keep moving to keep muscles looser," and a caudal block (Tr. 505).   Dr. Narotam further noted that Plaintiff "may work as he is able." (Tr. 509).

Plaintiff saw his therapist, Sharon Helregel, approximately 1-4 times a month from November 2013-July 2014 (Tr. 653-666).   According to her treatment notes, he described conflict with his girlfriend regarding the death of their infant child in March 2014 (Tr. 657).   He also discussed social anxiety and his fears of working with other people (Tr. 656), and the "hurt" he sustained from his mother and stepfather (Tr. 665).   In May 2014, Helregel prepared another Treatment Plan similar to Plaintiff's October 2013 plan (Tr. 425-435).

Plaintiff returned to see Dr. Narotam on June 18, 2014 (Tr. 512). Plaintiff completed a questionnaire that indicated he could not sit for more than one hour or stand for more than 30 minutes (Tr. 515). Dr. Narotam noted that Plaintiff tried therapy but was discharged after receiving a steroid injection that relieved Plaintiff's pain (Tr. 513). However, relief from the steroid injection was temporary (Tr. 513). According to Dr. Narotam's records, he instructed Plaintiff to attempt weight loss and walking several times a day to help alleviate his pain (Tr. 513-514). Plaintiff was to return in one month if weight loss and exercise were not successful (Tr. 514). Plaintiff presented to Dr. Narotam's office on July 9, 2014 and reported that he wanted to proceed with surgery (Tr. 518).

Plaintiff saw Dr. Hungerford (psychiatrist) at the Jasper County Health Department on July 12, 2014 (Tr. 639). He reported that on occasion, his hands shook so badly that he could not eat (Tr. 639). He also reported getting up several times in the middle of the night to check doors and windows (Tr. 639). He disliked leaving his house, but could not explain why (Tr. 639). In her Axis I Impression, Dr. Hungerford listed obsessive compulsive disorder (provisional) and generalized anxiety disorder (Tr. 640). Plaintiff also saw Dr. Hungerford on August 6, 2014 (Tr. 652). Plaintiff reported that he was anxious about upcoming events. Dr. Hungerford noted that she observed "a fine tremor of the hands" (Tr. 652). Plaintiff was taking Risperdone and Paroxetine (Tr. 652).

Plaintiff underwent back surgery with Dr. Narotam on August 8, 2014 (Tr 539). Dr. Narotam placed a screw at L5-S1, decompressed L4 and L5, and placed additional screws to reduce Plaintiff's spondylolisthesis (Tr. 539-540). Dr. Narotam performed foraminotomies from L4-S1 and a diskectomy at L5-S1 and L4-5 (Tr. 539).

Plaintiff returned to Dr. Narotam's office on September 14, 2014 (Tr. 563). He reported moderate aching in his back (Tr. 563). In responding to a questionnaire, Plaintiff reported that he was functioning "much better" since the surgery and he could "stand as long as I want but it gives me extra pain" (Tr. 564, 565). Nurse Practitioner Regina Battles noted that he could return to "light work; 15-30 lbs." (Tr. 564).

Plaintiff saw Dr. Tennison in April 2015 for a "check-up on anxiety medication" (Tr. 597). Plaintiff reported that he was "still having trouble with stress and anxiety and shakes a lot and worried about disability going thru" (Tr. 597). Plaintiff's back pain was "not much better than prior to surgery (Tr. 597).

Plaintiff returned to Dr. Tennison in August 2015 for a medication check-up (Tr. 594). Plaintiff was taking Risperdal, Xanax, and Wellbutrin for his depression and severe anxiety disorder (Tr. 595). Plaintiff stated that most of the medications did not sedate him "too much" (Tr. 594). Dr. Tennison noted that Plaintiff was "overall stable on current meds" (Tr. 596). Plaintiff's back pain was also stable (Tr. 596). Dr. Tennison encouraged him to use the community pool to lose weight, which would help his back and mood (Tr. 596).

Plaintiff also saw Dr. Narotam on August 12, 2015 (Tr. 614). Plaintiff completed a questionnaire in which he reported that the spine surgery had moderately improved his life (Tr. 615). He reported that he was functioning slightly better than he did before surgery (Tr. 616). Plaintiff could not sit for more than an hour or stand for more than 30 minutes (Tr. 616). Dr. Narotam noted that Plaintiff complained of severe back pain at the moment and continued to wear his brace (Tr. 614, 615). Dr. Narotam told him to discontinue using the brace (Tr. 615). Dr. Narotam discharged Plaintiff from his care, noting "Surgery was successful no neurological

deficits" (Tr. 615).

In October 2016, Dr. Tennison performed a depression screening (Tr. 934). Plaintiff reported that he felt depressed or hopeless almost every day (Tr. 934). Dr. Tennison's interpretation of the results was "severe depression" (Tr. 934).

Plaintiff started seeing Dr. Pavlovic at the Crawford Memorial Hospital Pain Clinic in late December 2016 (Tr. 907). He reported lower back pain radiating to bilateral hips that "started years ago and intensified recently" (Tr. 907). In 2017 he received four steroid injections, which provided significant but temporary pain relief (Tr. 878, 884, 887, 890, 894, 898, 914-917). After receiving a steroid injection in August 2017, Plaintiff presented to the Crawford Memorial Hospital Emergency Department with moderate hip and thigh pain (Tr. 1606). The ED physician's impression was sciatica (Tr. 1607).

Plaintiff received a "bilateral lumbar transforaminal steroid epidural injection" at the pain clinic in February 2018 that provided excellent relief "at one point" (Tr. 1694). In March 2019, Plaintiff saw Dr. Choyce Callahan at the pain clinic (Tr. 1695). Dr. Choyce Callahan believed that Plaintiff's lower back pain appeared to be "sacroiliac radiating into the hips" and recommended a "sacroiliac joint injection" (Tr. 1695). Plaintiff's insurance would not pay for the injection because Plaintiff had not attempted physical therapy (Tr. 1696). Dr. Choyce Callahan noted that Plaintiff was in significant pain and he did not believe Plaintiff could tolerate therapy, but he nonetheless recommended that Plaintiff attempt therapy (Tr. 1696). Plaintiff went to the initial therapy evaluation, but declined to participate further (Tr. 1703). He received the sacroiliac joint injection on June 24, 2019 (Tr. 1705). One month later, Dr. Choyce Callahan noted that Plaintiff was "doing very well" and received excellent pain relief from the joint injection (Tr.

1707).

### 5. Opinions by Dr. Hungerford (psychiatrist) and Sharon Helregal (therapist)

Plaintiff saw Sharon Helregal at the Jasper County Health Department for counseling. She completed a Medical Source Statement on March 18, 2014, noting that Plaintiff's symptoms related to his mood disorder, OCD, ADHD and PTSD "cause him great difficulty on a daily basis at home and in the community. He has difficulty with sustained attention, concentration, following through with tasks, and completion of tasks due to inattentiveness, impulsivity, and high anxiety. The same symptoms cause [Plaintiff] great difficulty when trying to make simple decisions." (Tr. 440).

Dr. Hungerford oversaw Plaintiff's care at the Jasper County Health Department. She also completed a Medical Source Statement on July 2, 2014, preparing an attachment that stated "Daniel's mental health and physical symptoms cause clinically significant distress and impairment in social, occupational, and other important areas of functioning. His impairment would affect his compression, retention, interaction between supervisors, co-workers and himself, being able to carry out instructions therefore affecting his ability to perform" (Tr. 439). Both Dr. Hungerford and Sharon Helregel indicated that Plaintiff's ability to complete a normal work day or work week was poor. (Tr. 437 and 440).

### 6. Opinions by Dr. Narotam

Dr. Narotam completed an "Ability to do work related physical activity form" on February 21, 2015 that instructed him to provide information regarding Plaintiff's condition "from October 10, 2010 to the present" (Tr. 573). Dr. Narotam indicated that Plaintiff could not stand or walk for even an hour a day, and he could not sit at a desk for even two hours a day (Tr. 573). When

asked which diagnoses he based these limitations upon, Dr. Narotam wrote "chronic [illegible] low back pain" and "lumbar fusion" (Tr. 574).

### 7. Consultative Exam: Jerry Boyd, PhD

Plaintiff presented to Jerry Boyd (clinical psychologist) on October 15, 2014 for a consultative exam lasting 41 minutes. Dr. Boyd noted that Plaintiff "could understand and follow simple, repetitive instructions. He is overwhelmed by multi-tasking" (Doc. 570). Plaintiff's "chronic anxiety interferes with concentration and persistence" (Doc. 570). Plaintiff reported that he does not leave home if he can avoid it, does not make eye contact, and becomes nervous in interpersonal settings (Doc. 570). Plaintiff appeared "to have limited coping skills and a low tolerance for even moderate stressors" (Doc. 570).

### 8. State Agency Consultants' Mental RFC Assessments

In 2014, Plaintiff's records were reviewed by two agency consultants, M.W. DiFonso, Psy.D., and Howard Tin, Psy.D (Tr. 77-78, 109-11). Both psychologists indicated that Plaintiff has sustained concentration and persistence limitations (*Id*.). Both determined that he is moderately limited in his ability to understand, remember, and carry out detailed instructions (*Id*.). Both determined that he is not significantly limited in his ability to complete a normal workday and work week without interruptions from psychological symptoms (*Id*.).

<u>Analysis</u>

**Swelling in Plaintiff's legs and side effects of medication**

Plaintiff first argues that the ALJ failed to consider his swollen legs and the side effects of his medication. Plaintiff testified that because his legs swell, he has to elevate his feet for 60-90 minutes a day. He further testified that he sleeps for at least two hours a day because his

medications make him drowsy.  The vocational expert testified that an individual who is off-task for 15% of his time-either because he was dozing from medications or elevating his feet-would be unemployable (Tr. 1047).   In his decision, the ALJ included Plaintiff's testimony regarding the need to elevate his feet and Plaintiff's drowsiness (Tr. 998).  The ALJ then concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause his alleged symptoms" but Plaintiff's subjective complaints were not entirely consistent with other evidence (Tr. 998).

The ALJ must consider the claimant's subjective complaints if a "medically determined impairment" could reasonably be expected to produce those symptoms. *Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014).  Here, after finding that Plaintiff's medically determined impairments could reasonably be expected to cause his reported symptoms, the ALJ subsequently refers to Plaintiff's drowsiness only by noting that Plaintiff reported to Dr. Tennison that one of his medications (Xanax) was not making him drowsy (Tr. 1003 and 1005).[4]  Regarding the swelling in Plaintiff's legs, the ALJ merely noted two instances in 2019 where Plaintiff's pain management physician observed that Plaintiff did not have any swelling, though no explanation is given as to whether the doctor was referring to any particular part of Plaintiff's body or his overall condition (Tr. 1001).   These limited references are insufficient consideration for symptoms that, according to the vocational expert's testimony, would prohibit Plaintiff from working.

It is improper for the ALJ to discount the "claimant's testimony about limitations on [his] daily activities solely by stating that such testimony is unsupported by the evidence."  *Moore*, 743

---

[4] The ALJ states that Dr. Tennison's notes indicate that Xanax did not make Plaintiff sleepy, and then cites hundreds of records (Tr. 1005). The undersigned noted only one instance where Plaintiff reported that Xanax was not making him drowsy/tired/sleepy, though that particular record (Dec. 4, 2015) is included in several places in the record. (Tr. 947).

F.3d at 1125. Here, the ALJ's mere mention of two instances where a physician observed no swelling (and perhaps just one instance that Plaintiff said Xanax did not make him sleepy-see footnote 4) is no more meaningful than a conclusory statement that Plaintiff's reported symptoms are not supported by the evidence.

Defendant contends that the ALJ addressed Plaintiff's swelling symptoms because the ALJ discussed Plaintiff's 2010 ankle injury. The ALJ's discussion of the ankle is irrelevant to this issue. Plaintiff testified that his legs swell and so he elevates his feet-not that his ankle or feet swell. Plaintiff further testified that his legs swell because he is overweight and from his back pain. Because the ALJ found that Plaintiff's subjective complaints could reasonably be expected to result from his medically determined impairments, the ALJ was required to consider Plaintiff's swollen legs and his need to elevate his feet 60-90 minutes a day in light of the vocational expert's testimony that an individual who has to elevate his feet 60-90 minutes a day is unemployable.

The Court acknowledges that the record provides little objective medical evidence regarding swelling in Plaintiff's legs. However, under these circumstances, the "ALJ may not discredit a claimant's testimony about [his] pain and limitations solely because there is no objective medical evidence supporting it." *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (*quoting Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Instead, the ALJ should develop a "more fulsome record." *Id*.

**Medical Opinions**

For a third time, the Court is being asked to determine whether the ALJ erroneously discounted the opinions of Plaintiff's treating psychiatrist, Dr. Hungerford. ALJ McScurry discounted Dr. Hungerford's opinions because she only saw Plaintiff twice and during one of those

visits, she noted that Plaintiff "felt his mood was more stable."  Once again, the ALJ has improperly focused on the records that reflect Plaintiff's good days. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("Suppose that half the time [he] is well enough that [he] could work, and half the time [he] is not. Then [he] could not hold down a full-time job.").   On remand, the ALJ should be aware that Dr. Hungerford's opinions should not be discounted simply because Plaintiff had both good and bad days.  For example, ALJ McScurry thought Dr. Hungerford's opinions were "extreme" in light of Plaintiff's ability to care for his child.  However, at the hearing, Plaintiff testified that his daughter "likes to go to Grandma's more than she stays with me. Grandma is more fun I guess, because dad doesn't do much" (Tr. 1037).

The undersigned acknowledges that Plaintiff only saw Dr. Hungerford twice. The ALJ relied heavily on the notes by Dr. Tennison, Plaintiff's primary care physician who saw Plaintiff frequently.  However, Plaintiff completed a depression screening at Dr. Tennison's office in October 2016, and Dr. Tennison's interpretation of the screening was "severe depression" (Tr. 934).  Dr. Tennison's notes include references to Plaintiff's good *and* bad days.  On remand, Dr. Tennison's notes should not be cited as a reason to discount the opinions of Dr. Hungerford, a specialist, without sufficient explanation.

Plaintiff also contends that the ALJ improperly rejected the opinions by Dr. Narotam, Plaintiff's treating neurosurgeon.  The Court agrees.  The ALJ opines that Plaintiff's January 2014 MRI results were a contraindication to the surgery Dr. Narotam performed in August 2014 ("despite these minimal objective findings, the claimant's treating neurosurgeon opted to address the claimant's subjective reporting with lumbar surgery").  An ALJ cannot "play doctor" and make conclusions about MRI results without an expert opinion interpreting the results in the

record.  *Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018).

The ALJ also discredited Dr. Narotam's opinions regarding Plaintiff's ability to stand for more than an hour and sit for two hours because Dr. Narotam's records indicate Plaintiff had a normal gait and minimally limited range of motion.  A "logical bridge" must connect the evidence and the ALJ's conclusion. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  It is not logical to conclude that because one can walk normally in and out of a doctor's office, then one can stand for more than an hour or sit for more than two hours.  On remand, the ALJ should consider obtaining the opinion of a medical expert on Plaintiff's ability to stand and sit post lumbar fusion surgery.  The prior consultative exams were performed before Plaintiff's surgery.

**Plaintiff's remaining arguments**

Plaintiff makes additional arguments regarding the weight given to the consultative exams and reviews by state agency psychologists, as well as the ALJ's mental RFC finding.  The ALJ based his RFC findings on the state-agency psychological assessments, and as noted, the ALJ will have the opportunity on remand to request updated medical opinions. *See Akin*, 887 F.3d at 318.

## Conclusion

This Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

After careful review of the record as a whole, the Commissioner's final decision denying Plaintiff's application for DIB and SSI benefits is **REVERSED and REMANDED** to the Commissioner for further proceedings consistent with this Order.

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: September 21, 2021**

_s/ Reona J. Daly_
**Hon. Reona J. Daly**
**United States Magistrate Judge**
